UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LISA JARAMILLO, KIM CHAVEZ, and
ANN CHAVEZ

       Plaintiffs,

     v.                         No. 09-634 JCH/WDS

ROGER BUSTAMANTE, ARLENE HICKSON,
ROBERT ULIBARRI, LINDA HERNANDEZ,
LADONNA CECIL, TRACY JONES,
in their individual capacities,
CORRECTIONAL MEDICAL SERVICES, and
CORRECTIONS CORPORATION OF AMERICA,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

      THIS MATTER comes before the Court on Defendants Roger Bustamante's, Donna

Cecil's, Tracy Jones's, and Correctional Medical Service, Inc.'s ("CMS's") (collectively, the

"CMS Defendants'") *Motion for Partial Summary Judgment* (Doc. 171).  Plaintiffs Lisa

Jaramillo, Kimberly Chavez, and Ann Chavez[1] bring this action under 42 U.S.C. § 1983 for

violations of their civil rights under the Eighth and Fourteenth Amendments and retaliation for

exercise of their First Amendment free speech rights; they further assert claims for negligence,

under the New Mexico Tort Claims Act; and for common-law breach of contract.  Specifically,

the Plaintiffs, who are inmates at the New Mexico Women's Correctional Facility ("NMWCF"),

allege that Bustamante sexually assaulted them while employed by CMS as a nurse at NMWCF.

In addition, Plaintiffs claim that individual Defendants retaliated against them for reporting

Bustamante's and another prison employee's sexual misconduct by conducting a sham

investigation and wrongfully imposing sanctions on them; Defendants failed to exercise

---

[1]Plaintiff Mary Lou Collins was terminated from this action on February 16, 2011.

reasonable care in providing for inmate safety; and corporate Defendants CMS and Corrections Corporation of America ("CCA") breached the service contracts under which they performed services at NMWCF, which required them to take all reasonably necessary steps to prevent reasonably foreseeable harm to inmates.

The instant motion contends that (I) Defendant Cecil is entitled to summary judgment on Plaintiffs' constitutional and retaliation claims; (II) Cecil and Defendants CMS and Tracy Jones are entitled to summary judgment on Plaintiffs' negligence claims;[2] and (III) CMS is entitled to summary judgment on Plaintiffs' constitutional and contract claims. The Court, having considered the motion, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that the CMS Defendants' motion should be granted in part and denied in part.

## FACTUAL BACKGROUND

### *The parties*

Plaintiffs Lisa Jaramillo, Kimberly Chavez, and Ann Chavez were, at the time of the events set forth below, inmates at NMWCF.

The CMS Defendants, who bring the instant motion, are CMS, the medical services provider to NMWCF, and three of its employees who worked in the prison: Roger Bustamante, a Licensed Practical Nurse until his suspension by NMWCF pending an investigation into, *inter alia,* Plaintiffs' allegations of sexual misconduct against him; Tracy Jones, Director of Nursing;

---

[2]While Bustamante is identified as a party to the instant motion, the CMS Defendants do not argue that he is entitled to summary judgment.

and Donna Cecil,[3] Health Services Administrator and Bustamante's direct supervisor.

The CCA Defendants, whose notice of joinder in the instant motion is addressed below, are CCA, the Nashville-based company that maintains and operates NMWCF; Linda Hernandez, identified in the Complaint as a Disciplinary Officer employed by NMCD; Arlene Hickson, Warden at NMWCF as of June 2008; and Robert Ulibarri, Chief of Security at NMWCF.[4]

### Bustamante's hiring by CMS

In August 2007, Bustamante successfully applied for a Licensed Practical Nurse position with CMS.  Pursuant to his application, Bustamante, who had previously worked in the correctional medical field at the Regional Correctional Center of New Mexico, was subjected to a National Crime Information Center security check by the New Mexico Department of Corrections (DOC) and was cleared to begin employment on August 17, 2007.

### Required training by CMS and CCA

As a new employee of CMS, Bustamante was required to complete two training requirements, one administered by CMS and the other by CCA. CMS required Bustamante to receive one-on-one training from Defendant Cecil, NMWCF's Health Services Administrator. An individual training session with Cecil typically lasted three days, during which the "new employee was trained by Ms. Cecil on security issues such as hostage situations, not having an officer in medical [sic] and inappropriate relationships."  (Doc. 172 at 3).  Jones, who

---

[3]Although Cecil is identified as "Ladonna Cecil" in the caption and "La Donna Cecil" in the Complaint, the Court follows the CMS Defendants' lead and refers to her as "Donna Cecil" hereinafter.

[4]All other Defendants formerly identified in the caption – Helen Carr, Allen Cooper, Marla Perez, Alberta Kanawhite, Irene Fernandez, and the New Mexico Corrections Department – have previously been terminated from this action.

participated in CMS training sessions, testified that new trainees were informed that "we don't engage in any kind of sexual activity with inmates," including "any kind of inappropriate touching, fondling.  If you're going to be alone with an inmate please have an escort . . . [because inmates] are not allowed into the [medical] unit without an officer."  (Doc. 172 Ex. C, Jones Dep. at 71:4-72:2).  Cecil estimated that she devoted "a couple of hours" of each new employee's training on security procedures at NMWCF, which included a tour of the facility. (Doc. 216 Ex. C, Cecil Dep. at 76:17).  At the conclusion of a training session, a new employee was given training books and informed of the timeframe within which to complete the training modules contained in the books.

While Cecil could not recall training Bustamante at her deposition, it is undisputed that he completed workbook training modules on CMS' Corporate Compliance Plan, Company Business Conduct Policy, Healthcare Code of Conduct, Sexual Harassment Awareness, and General Harassment Awareness by October 4, 2007; completed a module called "Let's Get Honest About Sexual Harassment" by October 19, 2007; and completed a module on "The Corrections Environment," which addressed subjects including the "reporting and recognizing [of] inappropriate inmate behavior [and] inappropriate staff behavior," by November 2, 2007. (Doc. 172 Ex. I).  Bustamante did not fully complete his CMS training requirements until December 20, 2007.

CCA required new employees to complete a 40-hour training by CCA, which included a one-hour component on sexual harassment.  Allen Cooper, a former Warden at NMWCF, testified at his deposition that "our policy is that everybody has to do their 40 hours of training before they're allowed in the compound.  And they will not get an ID to come in my facility until that training is complete."  (Doc. 216 Ex. D, Cooper Dep. at 148:4-148:8; *see also id.* at

4

149:5-149:14).  Similarly, Cecil confirmed that CMS employees of NMWCF should receive their 40-hour CCA training "before they hit the floor" of the medical unit.  (Doc. 216 Ex. C, Cecil Dep. at 72:11-72:16).

CCA records show that Bustamante met his CCA training requirements between December 17, 2007 and December 21, 2007, four months after he started working at NMWF. Cecil acknowledged at her deposition that an employee that did not complete his CCA training in a timely fashion would be treated in exactly the same way as an employee who did complete the training before commencing employment, with no reduction in the tardy employee's duties. Cecil testified that she did not perceive a higher risk associated with employees who, like Bustamante, did not complete their CCA training within the appropriate timeline because "I would go over security issues with them . . . [a]nything related to medical and security I specifically went over" as part of the new employees' CMS training.  *Id.* at 74:21-74:25.

It is undisputed that Bustamante understood before coming to work for CMS that having sexual contact with an inmate was strictly prohibited for nurses working in the correctional medical field.

***Supervision of new employees***[5]

CMS' official policy was that employees still undergoing training were not allowed to walk through the prison without an employee escort until their 40-hour CCA training was complete.  CMS Defendant Jones, Director of Nursing at the prison, testified that new employees are "not allowed to walk the halls alone, go into units alone, or at any point walk alone anywhere

---

[5]Many of the remaining facts are heavily disputed, as Bustamante denies that any of the alleged assaults occurred.  For the purposes of the CMS Defendants' summary judgment motion only, the Court accepts Plaintiffs' version of events and views the evidence in the light most favorable to them.

in the facility without an escort, be it medical staff or security." (Doc. 172 Ex. C, Jones Dep. at 48:2-48:5). Jones further testified that a new medical employee who had not completed his CCA training could not work "in the pill line" – passing out medications to inmates who stood in line to receive them through a two-inch window – without security present <u>outside</u> the window, which would be "sufficient at that point for an escort. They can walk in this medical unit [as opposed to the rest of the prison facility] without an escort." *Id.* at 48:16-49:14. Jones clarified that, regardless of the policy, new medical employees were "never alone. You always have your medical officer right here, you have your doctors, you have your physician assistants, you have myself or Ms. Cecil, you have medical records, you have our administrative assistant." *Id*. at 50:7-50:11.

Plaintiffs contend that CMS failed to enforce its policy that new employees were not permitted to be in the company of inmates unescorted in light of the allegations set forth below.

### CCA security staffing on the weekend

Bustamante's schedule required him to work 12-hour shifts on Fridays, Saturdays, and Sundays. Plaintiffs Lisa Jaramillo and Kimberly Chavez also worked weekend shifts as inmate "medical porters," whose duties included cleaning the medical unit. It is unclear from the summary judgment record whether CCA corrections officer were stationed in the medical unit on the weekends.

### Lisa Jaramillo's claims against Bustamante

Jaramillo began working as an inmate porter in the NMWCF medical unit in Autumn 2007. On a Saturday towards the end of October 2007, Jaramillo reported to the medical unit to train a new porter (Plaintiff Kimberly Chavez) to wax the floors of the unit. Over the course of the day, Bustamante made several inappropriate sexual comments to Jaramillo and kissed her

multiple times.  The following day, Bustamante ordered Jaramillo back to the medical unit to

mop the storage room.  He then followed her inside the storage room, where he kissed her,

forced her to masturbate him, and attempted to force her to perform oral sex on him.  When she

resisted, Bustamante pushed her against a cabinet and forcibly performed oral sex on her until

she was able to escape from the storage room, where she was observed by an unidentified nurse.

Jaramillo did not immediately report the incident for fear that Bustamante and/or other prison

employees would take retaliatory action against her.

***Contraband claims involving Jaramillo and Bustamante***

In a memorandum dated December 19, 2007, CMS Defendant and Health Services

Administrator Donna Cecil recorded that an unidentified inmate had privately informed her that

Bustamante was providing Plaintiff Jaramillo with tobacco.  Cecil advised CMS Defendant and

Director of Nursing Tracy Jones of the inmate's accusation. She then reported the incident to

CCA security at the prison, specifically to Assistant Warden Jerry Smith.  Cecil did not report

the incident to CMS Regional Management.

***Kimberly Chavez' claims against Bustamante***

On a Saturday towards the end of October 2007, while working as an inmate porter in the

medical unit, Plaintiff Kimberly Chavez was grabbed from behind by Bustamante, who

attempted to kiss her and was pushed away.  The next weekend,  Bustamante slapped Chavez'

backside while she cleaned a refrigerator in the medical unit.[6]  Also around this time, Chavez

had a conversation about Bustamante with Defendant Jones, who asked Chavez her opinion of

---

[6]Ms. Chavez testified at her deposition that she could not recall what month the incident occurred, and that her best guess was that it happened sometime between December 2007 and January 2008.

him.  Chavez informed Jones that she thought Bustamante was "a pervert."  Jones replied that she knew that Bustamante had been behind a closed door with Plaintiff Jaramillo, but that she (Jones) did not intend to report it.

Bustamante continued to sexually proposition Kimberly Chavez throughout Autumn 2007.

In January of 2008, Chavez was taking inventory in the storage room of the medical unit when Bustamante approached her from behind, rubbed his erection against her, and forcibly kissed her before she was able to push him away and exit the storage room.  On her way out, Chavez encountered an unidentified nurse, who observed her flustered demeanor.

Chavez did not immediately report any of Bustamante's conduct for fear of retaliatory action by Bustamante or other prison employees.

***Ann Chavez' claims against Bustamante***

Plaintiff Ann Chavez suffered from a Vitamin B-12 deficiency, which required her to go to the NMWCF medical unit for monthly B-12 injections in her lower hip.  Chavez' injections were always administered by a female nurse, in keeping with CMS policy.

In December 2007 Bustamante began making sexually suggestive comments to Ann Chavez as she stood to receive medication in the "pill line" or "med line."  At some point during the week of January 14, 2008, Plaintiffs claim that Chavez asked Bustamante during "med line" if it was time for her B-12 injection.  Bustamante answered in the affirmative, told Jones that he would administer the shot himself, and, when she protested, told her that she did not have a choice.  Bustamante then led Chavez into a side room of the medical unit and closed the door, leaving other inmates standing in the medication line.  In the side room, Ann Chavez lowered her clothing slightly to receive the injection in her hip, and Bustamante ordered her to pull her

garments down completely, administered the shot, and slapped and held her backside.  Like her

co-Plaintiffs, Chavez did not immediately report Bustamante's misconduct out of fear of

retaliatory action.

***Special investigation into Bustamante's conduct***

On January 24, 2008, Warden Cooper informed Cecil that Bustamante was being locked

out of the NMWCF facility pending an investigation into allegations against him made by

various inmates.  It is unclear how Cooper became privy to the Plaintiffs' allegations.  Cecil

immediately telephoned the Human Resources department at CMS headquarters in St. Louis,

Missouri to officially place Bustamante on suspension. Cecil and Defendant Jones then went to

an offsite location where Bustamante was receiving training from CCA and informed

Bustamante of his suspension.[7]

Also on January 24, 2008, after being advised by Cooper of the investigation into

Bustamante's conduct, Cecil summoned to her office Lynn Bourgeouis, a nurse who worked the

weekend shift with Bustamante.  She informed Bourgeouis that she was investigating a

complaint and asked her – according to a memorandum memorializing the meeting written the

same day – "how long Kim Chavez the medical porter had been coming into medical on the

weekends."  (Doc. 172 Ex. M).  Bourgeouis informed Cecil that Kimberly Chavez had been

entering the medical unit since she (Chavez) began working weekends about a month previously,

that Bustamante would talk to Chavez in the employee break room, had bought her take-out

lunch, and helped her wax the floors of the unit.  *Id.*  Cecil's memorandum recites that she asked

Bourgeouis whether Bustamante and Kimberly Chavez had been alone in the storage room

---

[7]Cecil and Bustamante have both testified that Bustamante was never terminated by
CMS, though he apparently remains on suspension.

together and Bourgeois answered yes.  Cecil then "reiterated with Lynn that Roger did not have permission for Kim to be in medical on the weekends for any reason because we do not have a correctional officer then."  *Id.*  In an attached handwritten statement, Bourgeois confirmed Cecil's account of their meeting, acknowledging that Kimberly Chavez "was found in the supply room with Roger with [the] door closed and was coming out as I was going in to the room.  I asked what she was doing and she said 'ordering supplies.'" (Doc. 172 Ex. O).

On January 30, 2008, Larry Flynn, Bureau Chief of Special Investigation/Internal Affairs for the NMCD ("SIIA") commenced an official investigation into allegations of sexual misconduct by Bustamante.  Flynn's Report of Investigation summarizes his interviews with each of the Plaintiffs, pursuant to which: (1) Jaramillo described how Bustamante attempted to perform oral sex on her in December 2007, threatened her with segregation if she reported the assault, further providing her with tobacco in an effort to keep her quiet; (2) Kimberly Chavez was interviewed twice, on January 30, 2008, and February 15, 2008, stated that she never had any inappropriate contact with Bustamante, was never alone with him or received any sexual advances from him;[8] and (3) Ann Chavez terminated her interview and referred Flynn to her attorney, Mark Fine.  Bustamante denied all allegations against him except for being alone with Jaramillo in the pharmacy.

In light of Bustamante's admission, the Report of Investigation found that he improperly

---

[8]Flynn appears to summarize only Chavez' January 30 interview, as it states elsewhere in the Report that Kimberly and Ann Chavez both refused to speak with Flynn on February 15, by which point they had allegedly "changed their stories and are now telling facility staff Bustamante did touch them inappropriately."  (Doc. 217 Ex. H at 9).

allowed Jaramillo in a controlled area.[9]  However, Jaramillo's allegation that Bustamante

forcibly performed oral sex on her was found to be "inconclusive," because of her refusal to take

a polygraph test.  In addition, Kimberly Chavez' and Ann Chavez' allegations of sexual

misconduct -- evidently made to NMWCF employees but not reiterated at their interviews with

Flynn --were determined to be "unfounded."  The Report concluded that "it appears there may be

a lawsuit regarding Bustamante[, and] it appears these inmates have now changed their stories in

an attempt to 'cash in' on the situation."  (Doc. 217 Ex. H at 9).

***Jaramillo's claims of retaliation***

Jaramillo's decision to pursue legal action against certain NMWCF employees was

common knowledge as of October 2008. She claims that individual Defendants determined to

retaliate against her for her pursuit of this suit, and for another exercise of protected speech –

Jaramillo's October 22, 2008, report to prison staff that Kimberly Chavez confided in her that

she (Chavez) had been sexually assaulted by NMWCF Corrections Officer Andrew Trujillo, who

is not a party to the instant action.

Shortly after Jaramillo reported Kimberly Chavez' allegations, Plaintiffs contend that

CCA Defendant Ulibarri placed Jaramillo into segregation pending an investigation.  Fearing

that she too would be placed in segregation or face other reprisal, Chavez refused to make a

statement about the matter.  Chief of Security Ulibarri subsequently initiated a misconduct report

against Jaramillo for purportedly fabricating the allegation, and on November 21, 2008,

Defendant Linda Hernandez, a Disciplinary Officer at NMWCF, found Jaramillo guilty of Fraud

and False Statement, and recommended a sentence of 60 days' segregation and 60 days' loss of

---

[9]Allegations of forgery against Bustamante – not at issue in the instant action – were also
sustained.

good time, which was adopted and imposed on November 24, 2008.  Jaramillo appealed the

decision to Cooper's successor as Warden, Arlene Hickson, and her appeal was denied.

After Jaramillo served over three months in segregation, Trujillo was terminated for

perpetrating sexual assaults on inmates including Kimberly Chavez.  Jaramillo's allegations

were subsequently re-investigated and her good time credit restored, though she had already

completed her segregation.

***Kimberly Chavez's claims of retaliation***

At some point in January 2008, Kimberly Chavez was terminated from her position as a

medical porter by Cecil, purportedly because of Chavez' allegations against Bustamante.  In

February or March 2009, Plaintiffs contend that Ulibarri further retaliated against Chavez by

placing her in segregation.

***Ann Chavez's claims of retaliation***

Ann Chavez was terminated from her position as an inmate maintenance worker on

February 20, 2008 by Ulibarri, also purportedly because of her pursuit of the instant legal action.

Chavez contends that Ulibarri bruised her arm in the process of forcibly removing her

maintenance employee nametag.


# LEGAL STANDARD

## *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be

rendered "where no genuine issue of material fact exists, and the moving party is entitled to

judgment as a matter of law."  *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th

Cir. 2006); *see also* Fed. R Civ. P. 56(c)(2).  The moving party bears the initial burden of

"show[ing] that there is an absence of evidence to support the nonmoving party's case."
*Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation
and marks omitted).  Once this burden has been met, "the burden shifts to the nonmoving party
to show that there is a genuine issue of material fact.  The party opposing the motion must
present sufficient evidence in specific, factual form for a jury to return a verdict in that party's
favor."  *Id.  See also Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir. 1993).  It is not enough for the
nonmoving party to "rest on mere allegations or denials of his pleadings" to avoid summary
judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also West v. New
Mexico Taxation and Rev. Dept.*, No. Civ. 09-0631, U.S. Dist. LEXIS 131626, at *42 (D.N.M.,
Oct. 31, 2010) ("[n]or can a party avoid summary judgment by repeating conclusory opinions,
allegations unsupported by specific facts, or speculation") (internal quotation and marks
omitted). In reviewing a motion for summary judgment, the court must "examine the factual
record and draw reasonable inferences therefrom in the light most favorable to the nonmoving
party."  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10th Cir.
2010).  Its function at this stage is "not . . . to weigh the evidence and determine the truth of the
matter, but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 243.

## DISCUSSION

### I. Plaintiffs' Supervisory Liability Claim Against Cecil

Plaintiffs assert a §1983 supervisory liability claim against CMS Defendant Donna Cecil,
Health Services Administrator for CMS, on the theory that "Cecil knew that Defendant
Bustamante had a history of sexual improprieties and/or misconduct at the facility" yet
"knowingly placed Plaintiffs in a dangerous situation and acted with deliberate indifference to

Plaintiffs' constitutional rights to be free from a substantial risk of serious harm, i.e., sexual assault, battery, and rape by NMWCF employees, in violation of the Eighth and Fourteenth Amendments."  (Doc. 1 Ex. A, Cplt. ¶¶ 132, 135).

The CMS Defendants contend that Cecil is entitled to summary judgment on the instant claim because, *inter alia,* she was not responsible for Bustamante's hiring and had no reason to question his conduct prior to hearing the allegation that he was supplying Plaintiff Jaramillo with tobacco on December 19, 2007.  Further, the CMS Defendants claim that Plaintiffs cannot sustain a §1983 claim against Cecil for failure to train Bustamante in appropriate conduct with female inmates, where Bustamante "had extensive training prior to coming" to NMWCF as a result of his previous employment in the correctional medical field, and continued training upon his arrival at the facility.  (Doc. 172 at 14).

The law is clear that Plaintiffs may not maintain a §1983 individual-capacity action against Cecil that is grounded in the concept of strict supervisor liability. *Brocks v. Bd. of Cty. Comm'rs of Sedgwick Cty., Kansas,* 329 Fed. Appx. 200, 202 (10th Cir. 2009) ("In an individual capacity suit [under] §1983 . . . the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation.") (internal quotation omitted); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[i]n a §1983 suit . . . the term 'supervisory liability' is a misnomer").  Thus, in order for a plaintiff to establish that a supervisor is liable under §1983 for the unconstitutional acts of her subordinates, the "plaintiff must first show the supervisor's subordinates violated the constitution," then "must show an affirmative link between the supervisor and the violation, namely the active participation or acquiescence of the supervisor" in the violation.  *Starks v. Lewis*, 313 Fed. Appx. 163, 167 (10th Cir. 2009).  "Because mere negligence is not enough to hold a supervisor liable under §1983,"

the Tenth Circuit has held that the "plaintiff must establish that the supervisor acted knowingly or with deliberate indifference that a constitutional violation would occur." *Id.* Moreover, because the deliberate indifference standard in a prison-conditions case is a subjective requirement, a "prison official is liable only if the official *knows of* and *disregards* an excessive risk to inmate health and safety. It is not enough to establish that the official should have known of the risk of harm." *Gonzales v. Martinez,* 403 F.3d 1179, 1186 (10th Cir. 2005) (emphasis added).

### Cecil's Knowledge of Bustamante's Conduct

The Court agrees that Plaintiffs fail to put forth evidence that Cecil actively participated in or acquiesced to Bustamante's alleged unconstitutional conduct. While Plaintiffs state generically that Cecil knew of Bustamante's sexual misconduct at NMWCF, the first report of Cecil being privy to any complaints about Bustamante occurred on December 19, 2007, when an unidentified inmate reported to her that Bustamante was providing Lisa Jaramillo with tobacco. There is no evidence that the informant claimed that Bustamante was sexually abusing Jaramillo or otherwise engaging in an inappropriate sexual relationship with her, and the record shows that Cecil took the tobacco accusation to another CMS employee, Defendant Jones, in addition to prison security (Assistant Warden Smith).[10] While Plaintiffs' brief contends that the SIIA's Report of Investigation reports that Cecil "and her staff had received numerous complaints about Bustamante,"(Doc. 216 at 32), the Report merely indicates that Cecil was interviewed about four memos she had written or commissioned about Bustamante – an apparent reference to four

---

[10]Plaintiffs claim that Cecil "ignored and did not investigate" the contraband allegation on her own (Doc. 216 at 31), but point to no authority requiring a Health Services Administrator to independently investigate such allegations about an employee under her supervision.

memos contained in the record, all of which involved either the December 19, 2007 contraband

allegation or reports of misconduct that emerged after Warden Cooper announced that an

investigation was underway.[11]   The Court finds no evidence from the documents cited in the

Report of Investigation that Cecil was aware of any possible sexual misconduct involving

Bustamante prior to her meetings with Warden Cooper and Lynn Borgeouis on January 24,

2008, the same day that Cecil placed Bustamante on indefinite suspension and took steps to have

him barred from the facility.   Further, the Court finds that Plaintiffs cannot claim on the strength

of the December 2007 tobacco report  – which Cecil promptly reported to both Jones and CCA –

that Cecil was deliberately indifferent to a substantial risk of harm to Plaintiffs posed by

Bustamante's purported tendency to *sexual misconduct*.

### Cecil's Deliberate Indifference to Plaintiffs' Safety

Plaintiffs also contend that Cecil manifested deliberate indifference to their safety by

allowing Bustamante to remain alone with inmate porters in the medical unit.  Cecil testified that

she had not heard of Bustamante's being alone with inmates until the day he was suspended, and

that "not having an offender in the medical clinic without an officer" was a highlight of the

training she gave to new medical employees at the prison.  (Doc. 172 Ex. F, Cecil Dep. at 77:20-

77:21).  Plaintiffs counter Cecil's testimony with the surmise that she "must have noticed that

---

[11]The memos described in the Report are: (1) the December 19, 2007 memo
memorializing the allegation that Bustamante was supplying Jaramillo with tobacco; (2) the
January 24, 2008 memo from Cecil memorializing the meeting she called that day with
Bustamante's co-worker Lynn Borgeouis;  (3) an unsigned handwritten memo from an
unidentified NMWCF employee dated January 25, 2008, stating that on January 12, 2008 the
memo's author and Borgeouis witnessed Bustamante and Chavez enter and exit the storage room
together and on January 6, 2008, the author and Bustamante "had ordered Chinese food, then on
1/7/08 Kim was eating his leftovers" (Doc. 172 Ex. N);  (4) a handwritten memo from Bourgeois
to Cecil dated January 24, 2008, confirming Cecil's account of their meeting.

the neglected floors had been waxed in the medical unit over the weekends, a time which she knew CCA did not staff her unit with medical officers.  In any event, it was her job to know who was in the unit."  (Doc. 216 at 32).  This is plainly insufficient to survive summary judgment. *See Gonzales,* 403 F.3d at 1186.  Because "the deliberate indifference standard in a prison-conditions case is a subjective and not an objective requirement," such that Cecil could only be found liable if Plaintiffs demonstrate that she "[knew] of and disregard[ed] and excessive risk to inmate health and safety," *id.,* it is not enough to imply that Cecil should have known that inmates were present in the medical unit on the weekends, or to speculate that she did know of the unattended presence of inmates because of the state of the floors.  Not only do Plaintiffs fail to put forth evidence that, if believed, would tend to show that Cecil was aware that Bustamante was alone with Plaintiffs, they critically fail to establish that – even if she was aware of the breach of protocol – her awareness amounted to an acquiescence to Plaintiffs' sexual assault.

### Cecil's Failure to Train Bustamante

The Court agrees with the CMS Defendants that Cecil is entitled to summary judgment on Plaintiffs' claim that she is liable under §1983 for her purported failure to adequately train Bustamante.  To be sure, the CMS Defendants' unsupported, conclusory claim, that "Bustamante had extensive training" as a result of his experience with a *prior employer* in the correctional medical field is not helpful to them. (Doc. 172 at 14).  However, Plaintiffs do not show how Cecil's failure to train Bustamante in prison procedures before his employment began constitutes acceptance of sexual misconduct of which he is accused.  In *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998), the Tenth Circuit held that even if a correctional officer's training was inadequate, it was "not persuaded that a plainly obvious consequence of a deficient training program would be the sexual assault of inmates.  Specific or extensive training hardly seems

necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."  The

court finds that the Tenth Circuit's logic applies with equal force here.  *See id.* (finding no

"obvious need" for defendant "to specifically train officers not to rape young women.").

Because the record contains no evidence tending to show that Cecil acted with deliberate

indifference to the alleged risk of harm to Plaintiffs posed by Bustamante, she is entitled to

summary judgment on Plaintiffs' § 1983 supervisory liability claim.

## II.  Plaintiffs' Retaliation Claim Against Cecil

Plaintiffs concede that Kimberly Chavez – the only Plaintiff to accuse Cecil of unlawful

retaliatory acts  in the Complaint  – cannot set forth sufficient evidence of retaliation.  *See* Doc.

216 at 36.  Thus, Cecil is entitled to summary judgment on this additional claim.

## III.  Plaintiffs' Negligence Claims Against Cecil and Jones[12]

In order to make out a state-law claim for negligence, Plaintiffs must establish the

common-law elements of a negligence suit: duty, breach, loss or damage, and causation.  *Alberts*

*v. Schultz,* 126 N.M. 807, 813 (N.M. 1999).  While no one disputes that the CMS Defendants

had a duty of reasonable care to safeguard inmates' health and safety, Count VIII of the

Complaint asserts that CMS Defendants Cecil and Jones failed to exercise that duty by "failing

[to] report evidence that they perceived of sexual misconduct by Defendant Bustamante"  (Doc.

1 Ex. A, Cplt. ¶ 180).

### <u>Cecil</u>

As discussed at length in reference to Plaintiffs' supervisory liability claim against Cecil,

Plaintiffs have not set forth evidence tending to show that Cecil had any inkling that Bustamante

---

[12]Plaintiffs' negligence claims are brought under the New Mexico Tort Claims Act, §§
41-4-6 and 41-4-9

was suspected of sexual misconduct before she was informed of the investigation into his behavior on January 24, 2008, by Warden Cooper.  *See supra* at 14-18.  Cecil could not have breached her duty to report alleged misconduct when she only became aware of the alleged misconduct once the investigation into it commenced.

### Jones

With regard to Jones, the only assertion that she perceived any sexual misconduct by Bustamante before January 24, 2008 can be found in Plaintiff Jaramillo's hearsay testimony that Kimberly Chavez told her in January 2008 that Jones had told Chavez "that she had knew that, I guess, something happened between [Jaramillo and Bustamante] that weekend [apparently the weekend that Bustamante allegedly sexually assaulted her in late October 2007], and she also knew that he was bringing in the tobacco to me and she never reported it."  (Doc. 172 Ex. R, Jaramillo Dep. at 332:24-333:7).  Plaintiffs cannot rely on Jaramillo's hearsay testimony as evidence that Jones knew of possible sexual misconduct by Bustamante and failed to report it.

Finally, Plaintiffs maintain that they have set forth a triable claim that Jones was negligent in continuing to utilize their services as inmate porters in the medical unit after learning from Cecil on December 19, 2007 that Bustamante had allegedly provided Jaramillo with contraband.  They contend that both Kimberly Chavez and Ann Chavez were assaulted by Bustamante in the period after Jones became aware of the contraband allegation (though Lisa Jaramillo was assaulted in October 2007, before the contraband allegation came to light).  Further, Plaintiffs argue that Jones' testimony that she responded to the allegation by reiterating to employees under her supervision, including Bustamante, the policy that "no inmates are allowed in medical without an officer" (Doc. 216 Ex. A, Jones Dep. at 93:3-93:9) only shows that Jones put Bustamante on notice that his conduct was being scrutinized, thereby making him

cagier and "ensur[ing] that he would not be caught." (Doc. 216 at 34).

Plaintiffs fail to set forth evidence from which a reasonable trier of fact could conclude that Jones breached a duty of care to keep Plaintiffs safe from sexual misconduct. As an initial matter, Jones' decision to keep inmate porters working in the medical unit on weekends, had no bearing on Ann Chavez' allegation that Bustamante took advantage of her position as a <u>patient</u> in need of an injection to remove her from the med line and assault her. Moreover, Plaintiffs do not attempt to explain how allowing inmates to work in the same unit as an employee suspected of smuggling tobacco manifests a negligence that resulted in Plaintiffs' sexual assault. The Court agrees with the CMS Defendants that Plaintiffs' evidence "fail[s] to establish the requisite causal connection between inmate porters in medical during the weekend and the harm claimed by Plaintiffs." (Doc. 230 at 19).

## IV. Plaintiffs' Negligence Claim Against CMS

Plaintiffs' briefing puts forth for the first time the theory that CMS is liable for negligence because it breached its *own* duty to exercise reasonable care for prisoners' safety, which resulted in their sexual assault. Previously, Plaintiffs contended only that CMS was vicariously liable for the negligent conduct of the individual CMS Defendants. Because the Court has found that Cecil and Jones are entitled to summary judgment on Plaintiffs' negligence claims, *see above,* and Plaintiffs appear to have abandoned their argument that CMS is vicariously liable for Bustamante's alleged acts of negligence,[13] the Court need only consider

---

[13]Plaintiffs previously contended that CMS was negligent under a theory of vicarious liability for Bustamante's breach of his "duty of care in the operation of the prison medical infirmary," (Doc. 1 Ex. A, Cplt. ¶ 153), as well as the negligent conduct   There is no mention of Plaintiffs' contention that CMS was vicariously liable for Bustamante's purported negligent acts – and indeed, no discussion of whether Bustamante's alleged conduct is properly categorized as negligent – in Plaintiffs' brief on the instant motion.

Plaintiffs' new theory of liability.

Plaintiffs do not specifically explain how CMS breached its duty of care in their response brief.  Instead, they indicate that the same "acts and omissions discussed" in reference to their § 1983 claim against CMS also underlie their negligence claim.  (Doc. 216 at 34).  Thus, it appears that Plaintiffs mean to contend that CMS breached its duty of care by: "grant[ing] staff unsupervised access to inmate porters"; encouraging "undue familiarity" between inmate porters and staff; allowing male employees to conduct medical examinations of female inmates without another female present; and allowing Bustamante to work in the medical unit for months before completing his training.  *Id.* at 25-29.

The Court finds that Plaintiffs have presented sufficient evidence from which a reasonable factfinder could conclude that CMS breached a duty of care to Plaintiffs by allowing them to be alone in the presence of male employees and by allowing Bustamante to work in the medical unit months before his training was complete.  While recognizing that corporate policies do not *ipso facto* create tort duties, the Court assumes for purposes of this motion that a jury could conclude – in light of testimony that CMS demanded that its employees should complete their security training before being allowed in the NMWCF facility – that CMS' practice of allowing untrained employees the same facility access and responsibilities as trained employees was negligent.  There is also a genuine factual dispute as to whether CMS adhered to a policy of not allowing its employees to be alone in the company of inmates, as Bustamante himself acknowledged to the Special Investigation Bureau at NMCD that he was alone in the company of Plaintiff Jaramillo.  Therefore, CMS' motion for summary judgment is denied on these specific facts.

Plaintiffs have not, however, set forth evidence tending to establish that CMS breached

its duty of care by encouraging "undue familiarity" between inmates and CMS staff.   Plaintiffs

cite two pieces of evidence that, they argue, show that CMS engages in a policy of encouraging

undue familiarity: (1) Jones' testimony that CMS employees were, if approved by the Warden,

permitted to provide inmate porters who "go over and beyond or do an extra duty for us" with

lunch (Doc. 216 Ex.A, Jones Dep. at 37:3-37:7); and (2) Bustamante's testimony that Jones gave

him permission to tutor Kimberly Chavez for her G.E.D, encounters that Plaintiffs contend were

"likely witnessed" and condoned by CMS staff.  (Doc. 216 at 27).  The Court finds these specific

contentions are simply too speculative to avoid summary judgment.

**V.  Plaintiffs' Supervisory Liability Claim Against CMS**

         A plaintiff seeking to establish the §1983 liability of a corporation that contracts with the

State cannot do so under a theory of *respondeat superior*, but rather must establish that the

corporation "had an official [ ] policy of some nature, that was the direct cause or moving force

behind the constitutional violations" that are alleged to have occurred.  *Dubbs v. Head Start,*

*Inc.*, 336 F.3d 1194, 1215 (10th Cir. 2003) (internal quotation and marks omitted); *see also*

*Monell v. New York City Dept. Of* Soc. Servs., 436 U.S. 658, 691 (1978); *DeVargas v. Mason &*

*Hanger-Silas Mason Co, Inc.*, 844 F.2d 714, 723 (10th Cir. 1988).  Liability for a policy or

custom shown to be the  moving force behind a constitutional violation is predicated on the

corporation's deliberate indifference to the safety of an individual or class, in this case the

inmate Plaintiffs. *Berry v. City of Muskogee,* Okla., 900 F.2d 1489, 1498 (10th Cir. 1990).  In

order to establish that an entity was deliberately indifferent to inmate safety, the Tenth Circuit

has held that a plaintiff must, first, show that the entity "had actual knowledge of the specific

risk of harm to [the inmate] or that the risk was so substantial or pervasive that knowledge can

be inferred"; second, that the entity "failed to take reasonable steps to avert the harm"; and third,

that the entity's "failure to take such measures in light of its knowledge, actual or inferred, justifies liability for the attendant consequences of its conduct, even though unintended." *Id.* (citations omitted).

With regard to the first prong of the *Berry* test, Plaintiffs argue that CMS' knowledge of the substantial risk of sexual assault to inmates in the NMWCF medical unit can be inferred from "the very fact that the risk was obvious," (Doc. 216 at 24), an apparent reference to the generalized atmosphere of a prison. *Cf. Howard v. Waide,* 534 F.3d 1227, 1242 (10th Cir. 2008) ("[t]he Supreme Court and the Tenth Circuit have repeatedly and unequivocally established an inmate's Eighth Amendment right to be protected from substantial risks of sexual assaults *by fellow prisoners*") (emphasis added). Plaintiffs, however, do not attempt to show how a specific risk of harm that was "very likely to result in the violation of a prisoner's constitutional rights" was posed by their proximity to CMS employees collectively *or* Bustamante in particular. *Berry,* 900 F.2d at 1496.  Instructive on this issue is *Hovater v. Robinson*, 1 F.3d 1063, 1066 (10th Cir. 1993), in which the Tenth Circuit found that a male detention officer's employer did not "disregard[] an obvious risk to the safety of female inmates by allowing a single male guard to have custody of a female inmate absent any indication that the guard would assault her." Though the defendant employer had a policy that female inmates, would, whenever possible, be escorted by female officers when moving within the jail, the Tenth Circuit rejected the plaintiff's argument that the policy demonstrated that the defendant knew of the risk to female inmates alone in the company of male guards, where the evidence in the record did not support the conclusion that that was necessarily the defendant's rationale in establishing the policy.  "[T]he mere existence of the policy at issue does not establish an obvious risk that females left alone with make guards are likely to be assaulted. . . To find a harm present in these circumstances

would, in effect, require the conclusion that every male guard is a risk to the bodily integrity of a female inmate whenever the two are left alone." *Id.* at 1068. The Court finds the Tenth Circuit's logic in *Hovater* to be equally applicable to a correctional medical employee like Bustamante.

In the absence of any evidence or argument that CMS had actual knowledge of a predisposition to sexual misconduct on the part of Bustamante, or alternatively, that CMS' alleged custom of allowing male medical professionals to be alone in the company of female inmates showed a disregard of an obvious, pervasive risk to the inmates' safety likely to result in the violation of their constitutional rights, the Court finds that Plaintiffs fail to meet the first prong of the *Berry* test. CMS is therefore entitled to summary judgment on Plaintiffs' supervisory liability claim under 1983.

## VI. Plaintiffs' Breach of Contract Claim Against CMS

Finally, the CMS Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for breach of contract against CMS. The crux of the CMS Defendants' argument is that Plaintiffs were merely incidental beneficiaries to the contract under which CMS performed services at NMWCF, and not, as the Complaint alleges, third party beneficiaries empowered to recover under the contract. Because neither party has submitted any portion of the contract at issue into the summary judgment record – or even cited to the contract in its brief – the Court is not in a position to determine the merits of the party's arguments. While Plaintiffs argue that "Defendants do not provide any support for their assertion that the Plaintiffs are incidental beneficiaries, and it would be difficult to support such an assertion," (Doc. 216 at 35), it is *Plaintiffs'* duty to set forth "factual allegations [sufficient] to raise a right to relief above the speculative level," in order to survive dismissal, let alone summary judgment. *Johnson v. Bd. of Curry County Comm'rs*, 2007 U.S. Dist. LEXIS 96214, at *6, 90 Empl. Prac. DEC. (CCH)

24

(D.N.M., Nov. 8, 2007); *see also Bell Atlantic v. Twombly*, 550 U.S. 544 (2007).  In an implicit

acknowledgment of their failure to attach the contract at issue to the briefing on their breach-of-

contract claim, Plaintiffs claim that "[i]rrespective of the terms of the contract between CMS and

DOC, by agreeing to provide healthcare services to New Mexico inmates there exists a

presumption that the [CMS] Defendants will render services with reasonable skill and care."

Doc. 216 at 35-36, citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 92, at

656-658 (5th ed. 1984) ("The reason the promisee or *third-party beneficiary* would have a cause

of action in tort and contract is that the duty of the promisor arises both from a common-law

duty to exercise ordinary care for the safety of the person of others and from an implied term of

contract to render services with reasonable skill and care").  Here, Plaintiffs put the cart before

the horse, as they not only fail to show that they are third-party beneficiaries to the contract, they

further fail to show how Bustamante's misconduct constituted a breach of CMS' duty "to render

services with reasonable skill and care."  Because Plaintiffs have failed to set forth evidence of

breach of contract against CMS sufficient to create a genuine dispute of material fact, CMS is

entitled to summary judgment on this additional ground.

### *The CCA Defendants' Notice of Joinder in the Instant Motion on Plaintiffs' Breach of Contract Claim*

The CCA Defendants have provided the Court with notice of their intent to join in the

instant motion for summary judgment as it relates to Plaintiffs' breach of contract claim:

"Plaintiffs have also asserted a breach of contract claim against CCA identical to that advanced

against CMS. . . . Notably, there is no dispute that CCA's contract in this case specifically states

that inmates are not intended third-party beneficiaries."  (Doc. 225 at 1).  Plaintiffs oppose

joinder, noting that the CCA Defendants did not challenge Plaintiffs' contract claim against

CCA by the February 28, 2011 deadline for the filing of dispositive motions; that because the CCA Defendants did not earlier challenge their claim against them, Plaintiffs did not address it in their opposition brief; and that "[a]s an equitable matter, it would be grossly unfair to allow the CCA Defendants to raise a new summary judgment argument by joinder, which does not provide Plaintiffs an adequate opportunity to brief their opposition."  (Doc. 228 at 2).  The Court agrees with Plaintiffs that, because the State of New Mexico evidently maintained separate contracts with CMS and CCA, "the CCA Defendants are not asking the Court to allow them to 'join' CMS's breach of contract argument, but rather to apply the legal analysis set forth in CMS' brief to the untimely dispositive argument, which they are raising for the first time by Joinder, that their own, separate contract was not breached."  *Id.* at 3.  Because allowing joinder would deny Plaintiffs the opportunity to respond to the CCA Defendants' claim that they are entitled to summary judgment with respect to a wholly different contract – and thus, to summary judgment on a wholly distinct contract claim – the Court finds that the CCA Defendants' joinder motion should be denied.


**CONCLUSION**

For the foregoing reasons, it is therefore ordered that the CMS Defendants' *Motion for Partial Summary Judgment* (Doc. 171) is granted in part and denied in part as follows:

1.      As to Plaintiffs' claim for  § 1983 supervisory liability against Donna Cecil, the CMS Defendants' motion is GRANTED.

2.      As to Plaintiffs' claim for retaliation against Cecil, the CMS Defendants' motion is GRANTED.

3.      As to Plaintiffs' claim for negligence against Cecil, the CMS Defendants' motion is GRANTED.

4.      As to Plaintiffs' claim for negligence against Tracy Jones, the CMS Defendants' motion
        is GRANTED.

5.      As to Plaintiffs' claim for negligence against CMS, the CMS Defendants' motion is
        DENIED.

6.      As to Plaintiffs' claim for § 1983 supervisory liability against CMS, the CMS
        Defendants' motion is GRANTED.

7.      As to Plaintiffs' breach of contract claim against CMS, the CMS Defendants' motion is
        GRANTED.

.

_____
**UNITED STATES DISTRICT JUDGE**