IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LISA JARAMILLO and KIM CHAVEZ,

    **Plaintiffs,**

**vs.**               CIV No. 09-634 JCH/WDS

ARLENE HICKSON, ROBERT
ULIBARRI, LINDA HERNANDEZ,
and CORRECTIONS CORPORATION
OF AMERICA,

    **Defendants.**

## MEMORANDUM OPINION AND ORDER

   This matter comes before the Court on *Defendants' Renewed Motion for Judgment as a Matter of Law and, In the Alternative, Motion for New Trial* (Doc. 405).  The Court having considered Defendants' motion, the parties' briefs, the trial transcript, and the relevant law, and being otherwise fully informed, finds that Defendants' motion should be denied for the reasons set forth below.

## BACKGROUND

   The instant motion centers on the sole claim on which Plaintiffs prevailed at trial. Plaintiff Lisa Jaramillo successfully brought a count for retaliation against two employees of Corrections Corporation of America ("CCA") -- Arlene Hickson, Warden at the New Mexico Women's Correctional Facility ("NMWCF") and Robert Ulibarri, NMWCF's Chief of Security – who she claimed retaliated against her for exercising her First Amendment right to freedom of speech during her incarceration at the prison.  Specifically, Jaramillo claimed that, after she truthfully reported an act of sexual misconduct by another CCA employee, Ulibarri and Hickson retaliated against her by initiating a misconduct report against her for making a false report;

approving her placement in segregation for over a month, pending an internal investigation and disciplinary hearing; denying her appeal from a disciplinary officer's determination that she committed the charged infraction; and continuing to segregate her from the rest of the inmate population for another 60 days as punishment, for a total of 92 days in segregation.[1]  Jaramillo was ultimately cleared of the charge of making a false report, and her good time restored. Having found Ulibarri and Hickson liable for retaliation, the jury awarded Jaramillo a total of $6,000.00 in compensatory damages and $60,000.00 in punitive damages.   The relevant evidence is set forth below.

**The Underlying Incident and Jaramillo's Report**

In 2006, Jaramillo, while walking down a prison corridor, observed another inmate, Kim Chavez, and Andrew Trujillo, a Corrections Officer at NMWCF, "pop up" in the window of Chavez' cubicle, before exiting the cubicle together.  (Doc. 417 Ex. 1 Tr. at 87:11-87:22). Jaramillo testified at trial that she later asked Chavez why the two were together, and Chavez informed her "that she had made out with him [Trujillo]."  *Id.*   Jaramillo testified that she thought the incident was "gross," in light of Trujillo's position, but did not immediately report it. *Id.* at 90:13-90:14.

In 2008, Jaramillo and Trujillo got into a heated argument after she reported him to Warden Hickson for failure to process her request for telephone privileges.  During the confrontation Jaramillo called Trujillo "one of the most crooked officers that I know," within the hearing of others.  *Id.* at 93:20-94:2.  Jaramillo testified that another CCA employee, Linda Calligan, then took her aside to ask what she meant by the remark, and she responded by telling her about Trujillo's kissing Kim Chavez.  Calligan told Jaramillo that she had a duty to report the

---

[1] The jury determined that a third Individual Defendant, Disciplinary Officer and CCA employee Linda Hernandez, was not liable on Jaramillo's retaliation claim.

incident, which she did.

**Jaramillo's Placement in Administrative Segregation, as Approved by Ulibarri**

Upon making her report, Jaramillo was contacted by a New Mexico Corrections Department investigator, Marla Perez. Perez interviewed Jaramillo twice on October 22, 2008. During the second interview, Perez accused Jaramillo of lying about Trujillo. By the end of the day on October 22, Jaramillo was placed in administrative segregation.

On October 24, 2008, Ulibarri approved Jaramillo's remaining in administrative segregation pending the outcome of NMWCF's investigation. In filling out a placement form, which indicated that the filer "must specify the reason for placement [in segregation]," Ulibarri failed to check a box indicating any of the listed reasons justifying segregation. *See* Doc. 417 Ex. 9. In the narrative portion of the form, however, Ulibarri wrote that "Jaramillo is to remain in interim Level VI pending the completion of the investigation." *Id.* At trial, Ulibarri testified that an inmate could not be placed "in segregation pending investigation of something that was not a serious criminal offense." (Doc. 405 Ex. 5 Tr. at 562:3-562:8). He further testified that he could not recall the reason for placing Jaramillo in segregation before determining whether she had committed an infraction, but suggested that it was "probably" because she was a threat to the security of NMWCF and/or had threatened Kim Chavez and/or committed other disciplinary infractions that were not reflected in his narrative on the placement form and/or needed to be "protected from other inmates that liked Trujillo" and may have sought to retaliate against her for making the report. *Id.,* Tr. at 568-589, 593.


**Confrontation With Hickson**

At some point shortly after she was placed in segregation, Jaramillo was taken to see

Warden Hickson.  Jaramillo testified that Hickson immediately accused her of making a false report and jeopardizing Trujillo's career:  "She said . . . [t]hat this young man had a wife, a child, and that I was going to ruin his life and his career by saying these things.  And basically at that point I said, 'I think he ruined his own,' and that was it."  (Doc. 405 Ex. 3 Tr. at 122:14-122:18).

**Disciplinary Hearing, Ruling, and Appeal**

On November 11, 2008, Jaramillo was charged with making a false statement about a staff member, and Ulibarri approved her continuing segregation as pre-hearing detention.  On a date not set forth by the parties, Linda Hernandez, a Disciplinary Officer at NMWCF, conducted Jaramillo's disciplinary hearing.  Kim Chavez declined to appear at the hearing to make a statement about the underlying incident.  Chavez testified at trial that her refusal to corroborate Jaramillo's report was due to her fear that she too would be accused of lying and placed in segregation.

On November 21, 2008, Hernandez found Jaramillo guilty of the offense of Fraud and False Statement, and recommended a sentence of an additional 60 days' segregation and 60 days' loss of good time, which was adopted and imposed on November 24, 2008.  Jaramillo appealed the decision to Warden Hickson; her appeal was summarily denied.

**Trujillo's Termination:**

Corrections Officer Andrew Trujillo was terminated from NMWCF for "undue familiarity" with inmates in early 2009.  Warden Hickson subsequently dismissed the misconduct report against Jaramillo and restored her good time.  At the time of Officer Trujillo's dismissal, Jaramillo had served 92 days in segregation.

## LEGAL STANDARDS

**Motion for Judgment as a Matter of Law Under Rule 50**

Judgment as a matter of law (JMOL) is appropriate only where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). On a motion for JMOL, the court views the evidence in the light most favorable to the nonmoving party and determines whether there is evidence upon which the jury could have properly relied in returning its verdict. *Klein v. Grynberg*, 44 F.3d 1497, 1503 (10th Cir. 1995). The court must draw all reasonable inferences in favor of the nonmoving party. *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir. 2004). The court may not reweigh the evidence or substitute its judgment for that of the jury. *Klein*, 44 F.3d at 1503. When there is conflicting testimony regarding the events and the defendants' actions, it is the jury's prerogative to weigh the credibility of the witnesses and determine whom to believe. *Id.* at 1503-04. The court should grant the JMOL only if "'the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'" *Hardeman*, 377 F.3d at 1112-13 (quoting *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1279 (10th Cir. 2003)).

A motion for JMOL under Rule 50(a) may be made at any time before the submission of the case to the jury. The motion for JMOL may be renewed after trial pursuant to Rule 50(b) no later than twenty-eight days after the jury is discharged. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

"Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."  Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment; *see Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1250 n.1 (10th Cir. 2013) (observing sufficiency of evidence issue requires both Rule 50(a) motion at close of evidence and Rule 50(b) motion after verdict).  Accordingly, a "party is entitled to JMOL only if the court concludes that 'all of the evidence in the record . . . [reveals] no legally sufficient evidentiary basis for a claim under the controlling law.'" *Wagner v. Live Nation Motor Sports. Inc.,* 586 F.3d 1237, 1244 (10th Cir. 2009) (quotation omitted); *see also Hysten v. Burlington N. Santa Fe Ry. Co.,* 530 F.3d 1260,1269 ("A party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'").

## Motion for a New Trial Under Rule 59

As an alternative to a Rule 50 motion for judgment as a matter of law, a moving party seek a new trial under Rule 59 of the Federal Rules of Civil Procedure.  *See Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1125 (10th Cir. 2012).  Pursuant to Fed. R. Civ. P. 59(a)(1)(A), a federal district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Nevertheless, a motion for a new trial is "generally not regarded with favor, and is granted only with great caution."  *United States v. Perea,* 458 F.2d 535, 536 (10th Cir. 1972); *see also Woolard v. JLG Indus..,* 210 F.3d 1158, 1168 (10th Cir. 2000) (a jury verdict will stand unless it was "clearly, decidedly, or overwhelmingly against the weight of the evidence").  The moving party "must show either trial error which constitutes prejudicial error or that the verdict was not based on substantial

evidence." *White v. Conoco, Inc.,* 710 F.2d 1442, 1443 (10th Cir. 1983).

## **DISCUSSION**

Defendants raise five issues in support of the instant motion:  (I) Whether there was sufficient evidence to support Plaintiff Lisa Jaramillo's retaliation claims against Defendants Ulibarri and Hickson; (II) If so, whether there was sufficient evidence to support an award of punitive damages against them; (III) Whether a new trial is warranted because the jury's verdict was tainted by improper evidence and argument; (IV) Whether a new trial should be ordered because the jury's verdicts were facially inconsistent; and (V) Whether remittitur or a new trial is warranted because Jaramillo was awarded excessive punitive damages.  The Court will take up each issue in its turn.

## **I.  The Verdict Was Supported By Sufficient Evidence of Retaliation**

First, Defendants seek a new trial on the ground that there was insufficient evidence introduced at trial from which the jury could have concluded that Defendants Ulibarri and Hickson retaliated against Plaintiff Jaramillo for truthfully reporting the misconduct of their colleague.  The jury was instructed that, in order to find any Defendant liable for First Amendment retaliation, Jaramillo must prove three elements:

(1) She was engaged in constitutionally protected activity;

(2) Ulibarri's, Hickson's, and/or Hernandez' adverse actions caused Jaramillo to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and

(3) Ulibarri, Hickson, and/or Hernandez were substantially motivated to commit adverse actions against Jaramillo as a response to Jaramillo's exercise of constitutionally protected conduct.

7

(Court's Jury Instruction No. 9, Doc. 397 at 11).[2]  Defendants do not challenge the sufficiency of Plaintiffs' evidence as to the first two elements, arguing only that there was insufficient evidence presented to the jury that could support a finding that Ulibarri's and Hickson's conduct was substantially motivated by a desire to retaliate against Jaramillo.

**Ulibarri's Conduct**

Defendants contend that Ulibarri's testimony is the sole evidence of his motive for approving Jaramillo's placement in segregation.  Ulibarri testified that he could not remember the reason why he initially authorized the placement, but stated that it was likely because Jaramillo posed a threat to the security of NMWCF, based on her lengthy disciplinary history. Defendants contend that "there is no evidence that [Ulibarri] even knew about Jaramillo's report against Trujillo at the time he approved her continued placement as Interim Level 6," and note that he later updated her segregation status after reviewing the investigator's findings that her report about Corrections Officer Trujillo was false.  (Doc. 405 at 14).

The Court finds that other evidence in the trial record supported the jury's finding that Ulibarri was substantially motivated to commit adverse actions against Jaramillo.  Specifically, Plaintiffs introduced evidence that, in signing the placement form authorizing Jaramillo's segregation, neither Ulibarri nor the staffer who passed the form on to him for approval checked any of the boxes corresponding to the following reasons for the placement (virtually all of which he variously proffered during testimony as probable bases for his decision): (1) "inmate poses a threat to the security of the institution as defined by policy," (2) "major disciplinary reports or pattern of minor disciplinary reports. . . . ," (3) "inmate is a suspect or the subject of an

---

[2] *See also Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007) (holding that First Amendment retaliation claim requires plaintiff to "prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights.").

investigation for a serious criminal offense," (4) "STG involvement or organized activity," (5)

"repeated behavior of unwillingness to comply with rules. . . . ," or (6) "involuntary inmate

protection: inmate in danger of bodily harm or violent acts from other inmate if she remains in

general population." (Doc. 417 Ex. 9). Thus, the only evidence of Ulibarri's intent from the date

in question was his comment in the narrative portion that Jaramillo was to remain in segregation

"pending the completion of the investigation." *Id.* The jury further heard from Plaintiffs'

corrections expert, Manuel Romero, that an offense under investigation must be "very serious or

very egregious" to justify pre-hearing segregation, and that, in his experience, filing a false

report would not qualify as a serious offense. *Id.* Ex. 5, Tr. at 767:6-767:7.

The Court finds that the jury could have reasonably rejected the testimony of Defendant

Ulibarri that he "probably" approved Jaramillo's segregation because she was a threat to the

security of the facility, *see supra* at 3, and instead concluded that it was a pretext for Ulibarri's

retaliating against Jaramillo for truthfully reporting a CCA employee's misconduct.

**Hickson's Conduct**

Defendants contend that Hickson cannot be liable for retaliation against Jaramillo when

she "was not even at the facility on October 22, 2012," the day that Commander Sarracino took

Jaramillo into segregation, and two days before Ulibarri formally authorized the segregation to

continue until her disciplinary hearing.[3] (Doc. 405 at 14). While Defendants concede that

Hickson later denied Jaramillo's appeal of the misconduct determination, which had the effect of

continuing the segregation, they point to Hickson's testimony that she made her decision based

---

[3] In fact, Hickson testified at trial that NMWCF staff contacted her by telephone at the time of Jaramillo's initial placement in segregation, and that she voiced her support for the decision: "I agreed with them and said, 'Absolutely. Move forward with whatever it is you have to do.'" (Doc. 405 Ex. 1, Tr, at 1091:12-1091:17). While the parties dispute whether this is evidence that Hickson could or did have a role in keeping Jaramillo in segregation before her disciplinary hearing, the Court need not reach the issue, as there is sufficient evidence in the record to support the jury's finding that Hickson retaliated against Jaramillo by denying her post-hearing appeal.

on the findings of Linda Hernandez and the report of investigator Marla Perez as demonstrating that "no reasonable jury could conclude" that retaliation played a part in her decision.  *Id.* at 14-15.

The Court finds the jury's verdict as to Hickson was supported by other evidence in the record.  Specifically, the jury appeared to credit Jaramillo's testimony that Hickson met with her before her disciplinary hearing, and castigated her for the effect her allegations could have on Officer Trujillo's family and career:  "She said . . . [t]hat this young man had a wife, a child, and that I was going to ruin his life and his career by saying these things."  (Doc. 405 Ex. 3, Tr. at 122:14-122:17).  Jaramillo told the Court that she maintained her innocence, and informed Hickson that Trujillo had "ruined his own" life.  *Id.* at 122:18.  Hickson did not deny this exchange occurred, but testified that she could not recall it.

Given that the confrontation between Jaramillo and Hickson preceded the former's disciplinary hearing and subsequent appeal, the jury could have reasonably inferred from Jaramillo's testimony that, at the time she denied the appeal, Hickson was already prejudiced against Jaramillo because of her desire to protect her colleague.  Consequently, the jury reasonably concluded that Hickson substantially based her decision to continue Jaramillo's segregation on her desire to retaliate against her, rather than a fair consideration of the record. Accordingly, the Court concludes that there was sufficient evidence in the record to support the retaliation verdicts entered against both Ulibarri and Hickson.

## II.  The Retaliation Verdicts Justified an Award of Punitive Damages

Next, Defendants argue that, even if the retaliation verdicts against Ulibarri and Hickson are upheld as sufficiently supported, Jaramillo's punitive damages awards should be vacated because Plaintiffs "did not present any evidence that Hickson or Ulibarri's conduct was

motivated by an evil motive or with reckless or callous indifference to her rights."  (Doc. 405 at

15) (citing *Jolivet v. Deland*, 966 F.2d 573, 577(10th Cir. 1992) (holding that punitive damages

are merited in § 1983 actions "only when the defendant's conduct is shown to be motivated by

evil motive or intent, or when it involves reckless or callous indifference to the federally

protected rights of others").  In support of their position, Defendants cite seven statements made

during Plaintiffs' closing argument as proof that Plaintiffs' counsel "at most argued negligence":

1. "[I]n having that . . . four months of segregation happen . . . CCA violated multiple policies.  In a sense, it was an abuse of power and a combination of sloppiness."  (Doc. 405 Ex. A Tr. at 1455).

2. "Ulibarri signed off on [a] segregation placement form that did not have specific details justifying placement, nor are any of the boxes checked."  *Id.,* Tr. at 1456.

3. "Exhibit 21 violated the corrections policy."  *Id.,* Tr. at 1457.

4. "[P]lacing Lisa Jaramillo in Interim 6 placement pending an investigation violated that policy."  *Id.*

5. "There was no five day classification committee review."  *Id.,* Tr. at 1458.

6. "Based on the failure to check those boxes and to fill out the documents appropriately . . . you can infer . . . [that] the real reason was to retaliate against Lisa Jaramillo for making a misconduct report with respect to Mr. Trujillo."  *Id.,* Tr. at 1459.

7. "If Ulibarri, Hickson, and Hernandez had followed policies rather than retaliate against Lisa for exercising her First Amendment rights, she would not have ended up in segregation for four months."  *Id.,* Tr. at 1462.

Defendants do not challenge the Court's jury instructions on retaliation or punitive damages.

The Court finds Defendants' examples inapposite for several reasons.  Foremost,

Defendants fail to explain how the jury could have reasonably found that Ulibarri and Hickson

were substantially motivated to retaliate against Jaramillo in violation of the First Amendment –

a finding that the Court has already determined was supported by sufficient evidence – and yet

conclude that various assertions made by Plaintiffs' counsel during closing argument left the jury

with the impression that, notwithstanding the pertinent jury instructions, it need only conclude that Defendants were negligent in their duties with respect to Jaramillo.  On the contrary, the jury found that two of three accused Defendants had the requisite retaliatory motive to find them liable in their individual capacities.  (Indeed, the jury's verdict in favor of the third Defendant, Hernandez, demonstrates its belief that Hernandez was not liable for her role in segregating Jaramillo, because she lacked the requisite state of mind.).  The jury was further instructed that it had discretion to

> award punitive damages against Defendants only if the Plaintiff has proved that Defendants acted with malice or willfulness or with callous and reckless indifference to the safety or rights of others.  One acts willfully or with reckless indifference to the rights of others when he acts in disregard of a high and excessive degree of danger about which he knows or which would be apparent to a reasonable person in his condition.

(Court's Jury Instruction No. 31, at 36). The pertinent jury instruction clarified that "punitive damages should be awarded only if a Defendant's misconduct, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."  *Id.*  The jury then determined that Ulibarri and Hickson acted with, at the very least, callous and reckless indifference to the safety or rights of Lisa Jaramillo, by segregating her from the inmate population for accurately reporting misconduct by a CCA employee.

Moreover, the above-quoted statements, viewed in their proper context, do not constitute an attempt to mislead the jury as to the elements of a retaliation claim.  In her closing argument, Plaintiffs' counsel, Maureen Sanders, did not argue that the Individual Defendants should be liable for retaliation due to their failure to follow CCA policy by filling out the segregation paperwork; rather, she suggested that Ulibarri's failure to follow the appropriate policy by stating the justification for Jaramillo's pre-hearing segregation on the segregation placement form

undermined his attempt to proffer a non-retaliatory reason for the placement at trial.  *See* Doc. 405 Ex. A. Tr. at 1459:15-1459:25 (Plaintiff's counsel advising jury "that the reasons that were thrown out in this trial" for Jaramillo's segregation were "not the real reason" it was ordered, because they were not cited on the form -- "Mr. Ulibarri . . . said if it's not written down it didn't happen.  We have to go with what is on the documents. . . [T]he real reason was to retaliate against Lisa Jaramillo for making a misconduct report with respect to Mr. Trujillo .").  While Plaintiffs' counsel did invoke the concept of negligence at various points in her closing, this was an apparent reference to Plaintiffs' theory that CCA was negligent in its operation of NMWCF – a separate cause of action that was rejected by the jury.

Accordingly, the Court finds that the retaliation verdicts against Ulibarri and Hickson justified an award of punitive damages.  The Court takes up the separate issue of whether the punitive damages awarded by the jury were excessive in Section V, below.

## III.  Defendants Were Not Substantially Prejudiced By the Admission of "Improper Evidence and Argument"

Third, Defendants argue that a new trial should be granted because Plaintiffs' counsel presented improper evidence and arguments to the jury that prejudiced their right to a fair trial. Defendants specifically identify five categories of evidence and argument that they allege cumulatively, "substantially and adversely," prejudiced Ulibarri and Hickson:  (1) comments during Plaintiffs' opening statement "that CCA [rather than the Individual Defendants] retaliated against Jaramillo for reporting Trujillo's conduct"; (2) testimony elicited from NMWCF Assistant Warden Jerry Smith and former Warden Allan Cooper that, prior to the events in issue, circa 2006, "75 % of the women at NMWCF who reported sexual misconduct by a staff member were placed in segregation"; (3) Cooper's additional testimony that, during his tenure, "a

reduction in [ ] incident reports against a staff member may have been a consideration in calculating bonuses," and that the number of grievance reports at the facility dropped from 1,061 in 2006 to 31 in 2007; (4) Plaintiffs' counsel's question to Hickson whether "'bad consequences' can occur 'if CCA locks up inmates who make an allegation against a staff person'"; and (5) Plaintiffs' counsel's asking the jury during closings to "hold CCA accountable and to send CCA a message." (Doc. 405 at 18). The Court addresses Defendants' objections below.

### Questions and Statements About CCA

Defendants do not identify the statements made by Plaintiffs' counsel about CCA that they claim were "so prejudicial . . . that [they] misled the jury and tainted its retaliation and punitive damages verdicts" in the argument section of their brief. *Id.* at 19. Their statement of facts, however, references a number of instances at which Plaintiffs' counsel appears to accuse CCA -- rather than its employees Ulibarri, Hickson, and Hernandez -- of retaliation. *See id.* at 6 (quoting attorney Mark Fine's comment during opening statement that "Corrections Corporation threw Ms. Jaramillo into the hole for a period of about three to four months. . . . And the corporation did this – they punished Ms. Jaramillo because she had reported this sexual abuse") (citation omitted); *see also id.* at 7 ("[CCA] violated [the New Mexico Corrections Department's] policies and procedures when they placed Ms. Jaramillo in the hole after she reported the sex abuse"). Plaintiffs respond that their opening and closing arguments encompassed their negligence claim against CCA, in addition to their retaliation claims against Ulibarri, Hickson, and Hernandez, and that the challenged statements were relevant to the former claim.[4]

The Court finds that Ulibarri and Hickson were not demonstrably prejudiced by the statements of Plaintiffs' counsel. The trial transcript shows that Defendants in fact objected to

---

[4] In fact, certain challenged statements plainly relate to Plaintiffs' negligence claim against CCA, on which CCA prevailed. *See* Doc. 406 at 10 (Defendants quoting Plaintiff's attorney's statement that "we want CCA to be held accountable for what happens in the prison that they run").

Plaintiffs' appearing to link CCA to Lisa Jaramillo's § 1983 retaliation claim against the

Individual Defendants during Plaintiffs' opening statement.  A bench conference ensued, during

which Plaintiffs' counsel argued that his references to CCA's conduct, including its alleged

failure to follow NMCD policies designed to encourage inmates to report incidents of sexual

misconduct, was not offered for purposes of "[c]onstruing the 1983 claim.  I'm not saying that."

(Doc. 405 Ex. 1, Tr. at 10:16-10:17).  Rather, Plaintiffs' counsel argued that his statements about

CCA fit into the larger scheme of his opening statement, which was intended to set forth "two

theories," retaliation and negligence:

> And so first, with regard to retaliation, we have to show that, through circumstantial evidence, that the motive for placing Ms. Jaramillo in segregation was retaliatory.  We can only do that through circumstantial evidence.  So that's the evidence I'm talking about.[5]

> The other part of the Court's summary judgment ruling was that we could make negligence claims based on [CCA's] failure to follow their own policies and procedures.  That's all I'm doing.

*Id.* at 12:8-12:17.

While the Court agrees that Plaintiffs' attempt to delineate their theories could have been

more precise, the crux of the instant dispute is whether Ulibarri and Hickson were substantially

prejudiced by counsel's apparent suggestion that their corporate employer retaliated against

Jaramillo.  There is no evidence that this was the case.  First, Defendants' theory that Plaintiffs

successfully confused the jury into holding CCA accountable is inconsistent with the jury's

verdict in favor of CCA on the only claim against it, for negligence.  As set forth above, the

Court's jury instructions clearly set forth that only the three Individual Defendants could be

found liable for retaliation, and the jury's mixed verdict as to Ulibarri, Hickson, and Hernandez

---

[5] The Court allowed Plaintiffs to elicit testimony about an alleged corporate policy linking employee bonuses to fewer incident reports but did not allow them to present evidence regarding the specific treatment of other inmates who reported sexual misconduct at NMWCF.

demonstrates that it evaluated the actions of each accused Defendant in his or her individual capacity.

Defendants counter that the legal error resulting from counsel's improper argument is nevertheless apparent in two questions the Court received from the jury during its deliberations. First, the jury submitted a note seeking clarification about Question 1 on the special verdict form, which asked if CCA's negligence was a proximate cause of Jaramillo's injuries.  The jury asked if Question 1 related only to Jaramillo's alleged "sexual assault or does it also include the violation of her [F]irst [A]mendment rights when it talks about her proximate cause of injuries?" (Doc. 402 at 1).  The Court answered that Question 1 did not relate to Jaramillo's retaliation claim.  *Id.* at 2.  Second, the jury submitted a question about whether punitive damages, if awarded, would be paid by the Individual Defendants "out of their own pocket or are the[y] covered under a collective insurance/CCA?" (Doc. 400 at 3).  The Court answered only by referring the jury to the Jury Instructions.  *Id.* at 4.  According to Defendants, the jury's first question proves that it mistakenly "believed that there was a retaliation claim against CCA," and its second question showed that "the jury wanted to send a message to CCA, not Hickson or Ulibarri."  (Doc. 405 at 19).

Defendants' first conclusion is not supported by the record.  If the jury was initially confused as to whether CCA could be found liable on Jaramillo's retaliation claim, the Court's answer to the jury's question and the language of Jury Instruction No. 9, which identifies Ulibarri, Hickson, and Hernandez as the only Defendants accused of retaliation, were sufficient to clarify the situation.

Further, Defendants' contention that the jury manifested the intent to improperly punish CCA for the offenses of the Individual Defendants is wholly speculative.  Indeed, Defendants do

not explain how the jury's question as to whether a third party insurance company might pay Ulibarri's and Hickson's punitive damages would "send a message to CCA."  All that *is* evident from the question is that the jury had in mind the potential financial burden of punitive damages on Ulibarri and Hickson at the time it considered the issue of what those damages should be.

### Elicited Testimony About CCA Staffers' Motive to Punish Inmates Who Reported Misconduct

Similarly, Defendants fail to show that they were substantially prejudiced by general testimony that past inmate reports of sexual misconduct had frequently resulted in the reporting inmate's segregation, and, further, that a reduction in such reports had been a consideration in calculating employee bonuses during the previous Warden's tenure.  Jaramillo contends this testimony was relevant to the negligence claim against CCA, and was also relevant to her retaliation claim because it was circumstantial evidence of Ulibarri's and Hickson's motive to punish inmates who reported misconduct.  The Court agrees.  As noted above, Defendant CCA prevailed on the negligence claim.  As for the retaliation claim, the Court notes that, even without this circumstantial evidence, there was sufficient other evidence in the record of Ulibarri's and Hickson's retaliatory motive.  *See supra* at 9-10.

Accordingly, the Court finds that Defendants' right to a fair trial was not substantially prejudiced by the admission of improper evidence or argument.

## IV.  The Verdict Was Not Facially Inconsistent

Next, Defendants argue that a new trial is needed because the jury's verdict that Ulibarri and Hickson retaliated against Jaramillo "cannot be reconciled with [its] verdict in favor of Hernandez," the Disciplinary Officer who formally determined that Jaramillo made a false statement about Officer Trujillo.  (Doc. 405 at 21).  "[A] party's failure to object to a verdict on the ground of inconsistency prior to the jury's discharge waives his right to raise the issue in a

posttrial motion or on appeal unless the verdict is inconsistent on its face so that entry of judgment upon the verdict is plain error." *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1424 (10th Cir. 1986). Here, Defendants concede that they did not object to the jury's verdict on grounds of inconsistency before the jury was discharged, but argue that, because the verdict was inconsistent on its face, the Court's entry of final judgment was plain error.

According to Defendants, by concluding that Officer Hernandez was not retaliating against Jaramillo when she found her guilty of making a false report, "the jury effectively determined that Jaramillo's false allegations against Trujillo were not protected First Amendment speech." (Doc. 405 at 20). Thus, Defendants' claim of facial inconsistency rests upon their contention that by finding Hernandez not liable for her role in segregating Jaramillo for making a false report, the jury impliedly found that her determination was correct. Defendants' argument ignores the fact that, in order to find a defendant liable for First Amendment retaliation, a factfinder must conclude that *multiple* elements are all present, and the requirement that the punished speech not be a knowing falsehood is merely one aspect of the first element. *See supra* at 7-8.

In this case, the jury evidently determined that Plaintiffs failed to show the third element of a retaliation claim with regard to Hernandez, by demonstrating that she was substantially motivated to retaliate against Jaramillo. Plaintiffs' theory of the case did not require the jury to believe that Ulibarri, Hickson, and Hernandez acted in concert to retaliate against Jaramillo – merely that they each, at different junctures in the disciplinary process, acted with a retaliatory motive to segregate Jaramillo from the general inmate population as punishment for bringing to light the misconduct of their colleague, Officer Trujillo. However, unlike Ulibarri and Hickson,

whose motives for segregating Jaramillo were subject to rigorous examination and cross-examination in front of the jury, Hernandez did not appear at trial.  Thus, the jury was left to assess Hernandez' intent from her deposition testimony, which was read into evidence by Plaintiffs' counsel.  At her deposition, Hernandez testified that her determination that Jaramillo had filed a false report was solely based on "[t]he lack of corroboration" from Kim Chavez that the incident had occurred.  (Doc. 417 Ex.7, Hernandez Dep. At 46:24-48:1).  While the jury's verdict demonstrates its belief that Jaramillo's report -- which was supported at trial by the corroborating testimony of Kim Chavez and by evidence that Trujillo was ultimately terminated for inappropriate contact with another inmate – was truthful, it was evidently not convinced that Hernandez acted with the requisite retaliatory motive, absent the kind of counter-evidence that undermined the testimony of Ulibarri and Hickson.

Accordingly, because there were no inconsistencies in fact in the jury's verdict, the Court will not order a new trial on this basis.

## V.  Jaramillo's Punitive Damages Award Is Not Excessive

Finally, Defendants contend that remittitur is warranted because the punitive damages awarded to Lisa Jaramillo were unconstitutionally excessive.[6]  "[T]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).  "In analyzing the constitutionality of punitive damages, the Supreme Court has instructed courts to look to 1) the degree of reprehensibility of the defendant's action; 2) the disparity between the actual or

---

[6] In the event that the Court finds the punitive damages award excessive and Plaintiff Lisa Jaramillo declines to consent to a remittitur, Defendants alternatively seek a new trial.  *See Klein v. Grynberg,* 44 F.3d 1497, 1504 (10th Cir. 1995) ("When a court concludes that there was error only in the excessive damage award, but no error tainting the finding of liability, it may order a remittitur or grant a new trial if the plaintiff refuses to accept the remittitur."). The parties dispute whether a new trial should be limited to the punitive damages issue, or whether the question of punitive damages is inseparable from the merits of Jaramillo's retaliation claim.  Because the Court finds that the jury's punitive damages award was not excessive, the issue is moot.

potential harm suffered by the plaintiff and the punitive damage award; and 3) the difference

between the punitive damage award and the civil penalties authorized or imposed in comparable

cases." *Hardeman v. City of Albuquerque*, 377 F.3d 1106 (10th Cir. 2004) (citing *BMW of N.*

*Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)).  Here, Defendants challenge only the first two

factors – reprehensibility and disparity.  *See* Doc. 405 at 23 n.6 (Defendants noting that third

factor "is not applicable here," as "Defendants are not aware of any civil penalties that are

authorized by statute or which have been awarded in other civil cases with similar facts").

### Degree of Reprehensibility of Ulibarri's and Hickson's Actions

"Perhaps the most important indicium of the reasonableness of a punitive damages award

is the degree of reprehensibility of the defendant's conduct."  *BMW,* 517 U.S. at 575.  In

assessing reprehensibility, the court must consider the following factors:

(1)  whether the harm caused was physical as opposed to economic;

(2)  whether the defendant acted with indifference or a reckless disregard for the health or safety of others;

(3)  the financial vulnerability of the plaintiff;

(4)  whether the defendant's wrongful conduct involved repeated actions or was an isolated incident; and

(5)  whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Jones v. UPS,* 674 F.3d 1187, 1207 (10th Cir. 2012) (citation omitted).

In favor of remittitur, Defendants contend that Lisa Jaramillo suffered "at most . . .

emotional, not physical harm," as a result of her stint in segregation, the effect of which was

"diluted" by her past placement in segregation for other infractions, which she admittedly

committed.  (Doc. 405 at 22).  Further, Defendants assert that Ulibarri and Hickson did not act

with indifference or reckless disregard for Jaramillo's health or safety, and that her placement in

segregation in fact protected her from "other inmates who were fond of [Corrections Officer] Trujillo," and were angry that Jaramillo had informed on him (even if this was not necessarily Ulibarri's and Hickson's motivation for the placement). *Id.*

Plaintiffs respond that the jury's verdict supports the position that it reasonably inferred that Ulibarri and Hickson took intentionally malicious actions towards Jaramillo in the following ways, for their own financial gain: permitting a corrections officer to engage in sexual misconduct with inmates, discrediting Jaramillo's viable report of that misconduct, punishing Jaramillo in an attempt to deter further reports, and, in Hickson's case, calling Jaramillo a liar and attacking her character in confronting her about the report. Plaintiffs further point to Jaramillo's testimony that Warden Hickson's accusations made her feel "kind of worthless," "upset," "mad," and "distraught," and that she cut herself with a razor during her segregation. (Doc. 417 Ex.2 at 123:6-123:14; 124:3-124:10)

The Court finds that aggravating factors associated with a high degree of reprehensibility are present in this case. The jury concluded that Ulibarri and Hickson acted with retaliatory motives -- i.e., with intentional malice -- in subjecting Jaramillo to an extended stay in segregation, during which she "received food through a portal in the door, was confined for 23 hours per day, was not permitted phone privileges, could not work, and was permitted only one hour to shower and go outside." (Doc. 417 at 22) (citing Doc. 417 Ex. 1 at 104:9-105:3). It is clear from the segregation placement forms issued by CCA that Jaramillo was not isolated for her own protection, but rather as part of "the disciplinary process." (Doc. 417 Exs. 10-11).

As a result of her segregation, Jaramillo suffered mental and emotional harm over a total of 92 days, including her time in administrative and post-sentence segregation, which culminated in her harming herself physically. Jaramillo testified that the segregation in issue, in contrast to

previous experiences being segregated for other infractions, had left her particularly hopeless "because I wasn't wrong. . . . I was stuck in this little room for something I didn't do."  (Doc. 417 Ex. 2 at 123:24-124:2).  The Court finds that the evidence thus supports a finding that Ulibarri and Hickson's actions toward Lisa Jaramillo were "sufficiently reprehensible to justify a significant sanction in addition to compensatory damages."  *BMW,* 517 U.S. at 576; *see also id.* n. 24 ("We cannot say [the exemplary damages] are excessive under the circumstances; for the proofs show that threats, violence, and imprisonment, were accompanied by mental fear, torture, and agony of mind") (quoting *Blanchard v. Morris,* 15 Ill. 35, 36 (1853).

### **Disparity Between Actual Harm Suffered and Punitive Damages Award**

The second factor to be considered in the reasonableness analysis is the disparity between the actual harm suffered by Lisa Jaramillo and the punitive damages she was awarded from Ulibarri and Hickson. The jury awarded Jaramillo $3,000 each from Ulibarri and Hickson in compensatory damages, along with $40,000 in punitive damages from Ulibarri (for a 13.3:1 ratio of punitive to compensatory damages), and $20,000 in punitive damages from Hickson (for a 6.7:1 ratio of punitive to compensatory damages).

As support for their position that the disparity between the actual harm suffered by Jaramillo and her punitive damages is too great to enforce against either Defendant, Defendants point to the Supreme Court's holding that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, *to a significant degree*, will satisfy due process." (Doc. 405 at 22) (quoting *Campbell,* 123 S. Ct. at 1524) (emphasis added).  Defendants further observe that the Supreme Court limited compensatory and punitive damages to a "1:1 ratio" in a maritime law case, *Exxon Shipping Co. v. Baker*, 554 U.S. 408, 425 (2003), and that Judge Browning of this court subsequently suggested in dicta that the Supreme Court's damages ratio

22

in *Exxon* should be "equally applicable in non-maritime cases."  *See Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,* 791 F. Supp. 2d 1026, 1048 (D.N.M. 2011) (the undersigned notes, however, that despite Defendants' contention that "the district court adhere[d] to" the *Exxon* standard in *Guidance*, Judge Browning in fact went on to hold that"[n]evertheless, the Court will apply the guideposts in *BMW of North America, Inc. v. Gore*, which remains controlling on a district court") (*see id*.).

Plaintiffs respond, *inter alia,* that the Supreme Court has held that "a smaller compensatory damage award can justify a larger disparity between the actual harm inflicted and the punitive damage award."  (Doc. 417 at 22) (*citing Campbell*, 538 U.S. at 425 ("[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.").  Plaintiffs further suggest that the $448, 196.43 that Jaramillo requests in attorney's fees and expenses should be divided in half and added to both compensatory damages calculations.

The Court finds that the punitive damages awarded to Plaintiff Jaramillo in this case were not constitutionally excessive.  First, with regard to Warden Hickson, Defendants have not cited any applicable caselaw suggesting the 6.7:1 ratio between the punitive and compensatory damages assessed against her violates her Due Process rights, as the jury's award does not exceed a single-digit ratio, let alone by a significant degree.  *See Campbell*, 538 U.S. at 425.

Further, with regard to the 13.3:1 ratio between the punitive and compensatory damages assessed against Officer Ulibarri, Defendants point to no controlling legal authority suggesting that this disparity is constitutionally excessive.  On the contrary, the Tenth Circuit has consistently affirmed damages awards with similar or greater disparities.  *See, e.g., Bielicki v. Terminix Int'l Co.,* 225 F.3d 1159, 1165 (10th Cir. 2000) (affirming damages award where "[t]he

ratio between the punitive damages and compensatory damages awarded by the jury is 12 to 1");

*Deters v. Equifax Credit Info. Servs., Inc.,* 202 F.3d 1262, 1272-73 (10th Cir. 2000) (punitive

damages award of $295,000.00 was not constitutionally excessive where compensatory damages

were only $5,000.00, because "both the Supreme Court and this court acknowledge that low

awards of compensatory damages may support a higher ratio if a particularly egregious act has

resulted in a small amount of economic damages").

Taking into consideration the reprehensibility of Jaramillo's extended segregation, the

relatively small amount of compensatory damages awarded to her, and the constitutionally

acceptable ratios between her punitive and compensative damage awards, the Court finds that

Jaramillo's punitive damages are not excessive, should not be remitted, and do not require a new

trial.  *See BMW* at 574-75.


## CONCLUSION

Therefore, for the reasons set forth above, the Court finds that Defendants' *Renewed*

*Motion for Judgment as a Matter of Law and, in the Alternative, Motion for New Trial* (Doc.

405) is DENIED.


Judith C. Herrera
United States District Court Judge